UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GERALD MEUSE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-11533-ADB |
| NATIONAL P.I. SERVICES, LLC, and JOHN DOES 1–10, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## **MEMORANDUM & ORDER**

BURROUGHS, D.J.

Gerald Meuse ("Plaintiff") alleges that National P.I. Services, LLC ("Defendant"), a consumer reporting agency ("CRA") that prepares background screening reports at the request of different companies, violated various provisions of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FCRA"), and Massachusetts General Laws chapter 151B, § 4(9) by providing reports that contained prohibited details about Plaintiff's criminal record, as well as other false or misleading statements.

Presently before the Court are the parties' cross motions for summary judgment, [ECF Nos. 37, 46]. For the reasons set forth below, Defendant's motion is <u>DENIED</u> on all counts. Plaintiff's motion is <u>DENIED</u> as to Counts I and III and <u>GRANTED</u> as to Count II.

## I.   Background

### a.   Material Facts[1]

On or about August 29, 2019, Plaintiff applied for a firefighter position with the Everett

Fire Department (the "Fire Department") in Everett, Massachusetts.  [ECF No. 49-1 ¶ 1; ECF

No. 50-1 at 1].   In that application, Plaintiff disclosed several pieces of information relevant to

the Court's analysis, including: 1) that he faced an assault charge in 2011, resulting from an

argument with a former girlfriend (Beatrice Mays or "Ms. Mays"), and that the charge was

"dismissed," [ECF No. 47-3 at 9]; 2) that at the time of his application, he was employed by the

U.S. Army National Guard, Encore Casino, and Lyft, [id. at 10]; and, 3) that he lived at 225 Main

Street in Everett from 2015-2018, [id. at 20].   He also provided three references, including a

friend named Kyle North (or "Mr. North") and Ms. Mays, [id. at 12].

As part of the application process, the Fire Department procured a background screening

report ("the Report") regarding Plaintiff from Defendant.  [ECF No. 49-1 ¶ 1].  Mr. Frank Santin

("Mr. Santin"), Defendant's owner, authored the Report and signed it.  [id. ¶ 12].  In conducting

Plaintiff's background check, Defendant was acting as an agent of the Fire Department.  [id. ¶ 4]

In the Report, Defendant disclosed that, on November 25, 2011, Plaintiff was arrested

and charged by the Norfolk Virginia Police with assaulting Ms. Mays and for violating a

restraining order.  [ECF No. 49-1 ¶¶ 2, 8; ECF No. 47-2 at 5; ECF No. 50-1 at 11–12].   The

charges against Plaintiff were ultimately dismissed and, therefore, did not result in a conviction.

[ECF No. 49-1 ¶ 3].   As part of compiling the Report, an investigator working for Defendant

---

[1] The Court draws the facts, unless otherwise stated, from the parties' combined Rule 56.1 statements of material facts, which are Plaintiff's Reply to Defendant's Opposition to Plaintiff's Statement of Undisputed Facts, [ECF No. 49-1], and Plaintiff's Opposition to Defendant's Statement of Undisputed Facts, [ECF No. 50-1], as well as documents referenced therein and, where necessary, the record.

spoke with Ms. Mays on September 19, 2019, and asked her if she could recount "the situation that resulted in Gerald being charged in 2011," which she did.  [ECF No. 50-1 at 11–12].

On September 24, 2019, Defendant interviewed Plaintiff at a home visit.  [ECF No. 47-2 at 9; ECF No. 50-1 at 12].  During that interview, Defendant "inquired about the issue that involved Norfolk Police and [Plaintiff's] ex-girlfriend."  [ECF No. 47-2 at 9; ECF No. 47-1 at 28].  According to the Report, Plaintiff responded that he was never arrested.  [ECF No. 47-2 at 9].

In summarizing Plaintiff's home visit interview, the Report also included information regarding Plaintiff's residence, job history, and professional training and certifications.  See [ECF No. 47-2 at 9].  In relevant part, the Report included the following language:

- [Plaintiff] claims that . . . between 2015-2018 [he] resided at 225 Main St. Everett address . . . with a friend 'Kyle North' who owned the property . . . I ran an inquiry through voter's registration in order to tie [Plaintiff] physically to that address and learned that he was not a registered voter.
- [Plaintiff's] job history before and after his military service is hard to verify.  He makes his money as a Lyft driver and he occasionally works for Encore Casino as a Security Officer.  He informed us that his work references will be hard to contact.
- [Plaintiff] has gone to school for psychology however he never bothered to take any classes in fire science or get certified as an EMT which would indicate that he is not entirely vested in a career with Everett Fire.

[Id.]

As part of assembling the Report, Defendant also utilized a research tool that it uses in its regular course of business ("TLO Report").  [ECF No. 47-2 at 10; ECF No. 49-1 ¶ 16].  The TLO Report listed 225 Main Street as Plaintiff's address between July 13, 2015, and September 18, 2019.  [ECF No. 47-2 at 10].  It also listed Lyft as a possible employer.  [Id.].[2]

---

[2] It is worth noting that the parties have created an odd factual dispute as to whether the TLO Report was included in the Report provided to the Fire Department, as well as what other

There are few facts in the record as to what, outside of running the TLO Report and checking voter registration, Defendants did to verify Plaintiff's job history, prior residences, and professional certifications.  Regarding Plaintiff's job history, there is no evidence in the record that Defendant attempted to contact the U.S. Army National Guard, although the Report does include a contact phone number for the National Guard.  See [ECF No. 47-2 at 7].  Mr. Santin testified at deposition that he does not know how many times Encore was contacted to verify Plaintiff's employment, although he believes it "unlikely" that it would be only once.  [ECF No. 49-1 ¶ 18].  There is no evidence that any of the investigators from Defendant's company requested any pay stub or pay record information in conducting the background check.  [Id. ¶

---

information might have been provided with the Report.  Plaintiff has provided the Court with a "true and correct" copy of "the Report" four times since initiating this action.  See [ECF No. 13, Ex. 2; ECF No. 23, Ex. 1; ECF No. 47-2, Ex. 1; ECF No. 47-3, Ex. 7].  The first two filed versions, filed with Plaintiff's "Notice of Supplemental Authority" [ECF No. 13] and First Amended Complaint [ECF No. 23], include the TLO Report, as well as several pages of criminal history search results.  [ECF No. 13, Ex. 2; ECF No. 23, Ex. 1].  Plaintiff, however, also filed two versions of the Report at the summary judgment stage, neither of which include criminal history information and only one of which contains the TLO Report.  [ECF No. 47-2, Ex. 1; ECF No. 47-3, Ex. 7].  Moreover, one of the summary judgment versions appears to be incomplete on its face, given that it is defined as a "true and correct copy of Plaintiff's background check report prepared by Defendant and produced in discovery bearing bates stamp numbers Meuse 0002-0022," but twelve of those bates stamped pages are missing.  [ECF No. 47-2, Ex. 1].  Defendant has provided one copy of the Report, which does not include the TLO Report or the criminal history searches, [ECF No. 38-6], but Defendant's own 30(b)(6) witness testified that the TLO Report was "part of the package that Everett received."  [ECF No. 47-2 at 115].  Meanwhile, Plaintiff argues at summary judgment that the TLO Report was "not disclosed to the Fire Department," [ECF No. 47 at 5], while also admitting in response to a statement of fact that Defendant "attached" the TLO Report to the Report, [ECF No. 49-1 ¶ 16].  As reflected infra, the Court has determined that certainty regarding the full contents of the Report is not necessary to make the determinations required at summary judgment.  This is because the completeness of the Report is either irrelevant to the analysis or any relevant factual issue regarding its full contents is subsumed by other genuine issues of material fact.  That said, a true and correct copy of the Report would seemingly be helpful to a reasonable jury determining liability and/or the extent of Plaintiff's damages.

17].  There is also no evidence that Defendant asked Plaintiff about his job history. [Id. ¶ 19[3]].

Regarding the EMT certification, Mr. Santin testified that he never spoke to Plaintiff, including

to ask him whether he received an EMT certification, nor does he know whether any of his

investigators asked Plaintiff about his EMT certification.  [Id. ¶¶ 13–14].

On March 11, 2021 the Fire Department, in the exercise of its discretion, determined that

Plaintiff was not a suitable candidate for employment and listed four reasons for the decision: 1)

Defendant's "report states [Plaintiff's] job history before and after he left the military is hard to

verify," 2) Defendant "found no proof that [Plaintiff] lived" at 225 Main Street, 3) Plaintiff

"claimed he was never arrested for an assault, but was in fact arrested," and 4) Plaintiff "claimed

he was never arrested for a violation of restraining order, but was in fact arrested."  [ECF No. 50-

1 at 15].

On March 30, 2021, Plaintiff filed an appeal with the Civil Service Commission,

contesting the decision of the Fire Department to bypass him for employment.  [ECF No. 50-1 at

15–16].  On July 14, 2022, the Civil Service Commission reversed the bypass order.  [Id. at 19].

On May 8, 2023, the Fire Department sent Plaintiff a "formal offer to participate in the Everett

Fire Department's hiring process." [Id. at 19–20 (emphasis omitted)].  The parties dispute

whether this constitutes an offer for employment.  [Id.].

---

[3] Plaintiff argues that Defendant typically would have asked a prospective applicant about his
employment history during the home visit but failed to do so in this case; however, as support for
that argument, Plaintiff cites to portions of a deposition that were not provided to the Court.
[ECF No. 49-1 ¶ 19].  In the absence of such record support, and viewing the facts in a light most
favorable to Defendant in considering Plaintiff's motion for summary judgment, the Court
cannot conclude that Defendant should have asked Plaintiff to verify his employment and failed
to do so.

### b.  Procedural Background

On September 19, 2021, Plaintiff filed a three-count complaint alleging three FCRA violations: (1) 15 U.S.C. § 1681e(b) (Count I); (2) 15 U.S.C. § 1681k(b) (Count II); and (3) 15 U.S.C. § 1681c(a)(2) (Count III).  [ECF No. 1 ¶¶ 31–43].  Between November 2021 and February 2022, Defendant filed a motion to dismiss, [ECF No. 6], and Plaintiff moved to amend the complaint to, among other things, add a claim for violation of Massachusetts General Laws ch. 151B, § 4(9).  [ECF No. 14].  On July 7, 2022, the Court granted Defendant's motion to dismiss in part and denied it in part, and also granted Plaintiff's motion to amend the then-operative amended complaint.  [ECF No. 22 at 19].  The Court dismissed two of the three FCRA claims, Count I (15 U.S.C. § 1681e(b)) and Count II (15 U.S.C. § 1681k(b)), for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). [Id. at 7–10].

On June 27, 2023, Plaintiff filed a second motion to amend the complaint to add back a claim under 15 U.S.C. § 1681e(b) in light of facts learned during discovery.  [ECF No. 30; ECF No. 31 at 2].  Defendant opposed on July 10, 2023.  [ECF No. 33].  The Court granted the second motion to amend the complaint on October 20, 2023.

Plaintiff filed the operative, second amended complaint ("SAC") on October 24, 2023, alleging violations of the FCRA and Massachusetts state law.  Specifically, the Complaint consists of three counts: (1) 15 U.S.C. § 1681c(a) (Count I), (2) Mass. Gen. Laws ch. 151B § 4(9) (Count II), and (3) § 1681e(b) (Count III).  [ECF No. 35].  Defendant answered the Complaint on October 27, 2023.  [ECF No. 36].  After a discovery period, both parties moved for summary judgment as to all counts on February 15, 2024.[4]  [ECF Nos. 37, 46].

---

[4] Plaintiff experienced technical difficulties in filing his motion for summary judgment and re-filed on February 20, 2024, after having been granted leave to do so.  [ECF Nos. 39–46].

II.    **Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is considered "genuine" when "the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A fact is considered "material" when "its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5 (citing Martínez v. Colón, 54 F.3d 980, 984 (1st Cir. 1995)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the Court] to specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5.

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment." Podiatrist Ass'n, Inc. v. La Cruz Azul De P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs–Ryan v. Smith, 904 F.2d 112, 115 (1st Cir.1990)). Where inferences are to be drawn from the stated facts, those inferences

7

"must be viewed in the light most favorable to the party opposing the motion." Oleskey ex rel. Boumediene v. U.S. Dept. of Defense, 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (citing Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)). The Court, however, "safely may ignore conclusory allegations, improbable inferences, and unsupported speculation." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (internal quotation and citation omitted).

When a court faces cross motions for summary judgment, it applies the above analysis, unaltered, "to each motion in turn." Wilkinson v. Chao, 292 F. Supp. 2d 288, 291 (D.N.H. 2003) (citing Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)); see also Cochran, 328 F.3d at 6 ("This framework is not altered by the presence of cross-motions for summary judgment.").

## III. Discussion

### a. FCRA Claims (Counts I and III)

Before turning to Plaintiff's specific FCRA claims against Defendant, the Court must address two preliminary issues raised by Defendant (for the first time) in its motion for summary judgment. Specifically, Defendant argues (1) that it is not a "consumer reporting agency" as defined by the FCRA and (2) that the Report was not a "consumer report" as defined by the FCRA and, in the alternative, that it is exempted under 15 U.S.C. § 1681(a)(d)(2) and (o)(2)(A). [ECF No. 38 at 10–12, 16–17].

Defendant first claims that it is not a consumer reporting agency as defined by the FCRA because it "neither assembles or evaluates consumer credit information, nor does [it] furnish consumer reports to third parties." [ECF No. 38 at 11]. The FCRA defines a "consumer reporting agency" in relevant part as "any person which, for monetary fees . . . regularly engages

in whole or in part in the practice of assembling or evaluating consumer credit information or

other information on consumers for the purpose of furnishing consumer reports to third parties,

and which uses any means or facility of interstate commerce for the purpose of preparing or

furnishing consumer reports."  15 U.S.C. § 1681a(f) (2021).  "Person," as used in the statute, is

defined as "any individual, partnership, corporation, trust, estate, cooperative, association,

government or governmental subdivision or agency, or other entity," and "consumer" is defined

as "an individual." 15 U.S.C. § 1681a(b), (c).  The FCRA generally defines a "consumer report,"

in relevant part, as:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, *character, general reputation, personal characteristics, or mode of living* which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . .  (B) employment purposes . . . .

15 U.S.C. § 1681a(d)(1) (emphasis added).

Based on the record before the Court and these statutory definitions, Defendant is a

consumer reporting agency.  Defendant is an investigative services company which, in exchange

for a monetary fee, assembles and evaluates "consumer reports" (in this case, called "background

check reports" consisting of consolidated criminal history reports, consumer interviews, TLO

reports, etc.) relating to job candidates for the purpose of furnishing these reports to third parties

(e.g., the Fire Department) by means of interstate commerce (e.g., sending or receiving the

reports).  Therefore, Defendant is bound by the requirements of the FCRA.

The second preliminary issue the Court must address is Defendant's argument that even if

Defendant is generally a covered entity under the FCRA, pursuant to § 1681a(o), the Report is

exempt from the definition of a consumer report.  "Under 15 U.S.C. § 1681a(o), a

communication is not considered a consumer report if (1) it fits the definition of an investigative consumer report; (2) it is made to procure an employee by a person who regularly performs such procurement; (3) the subject of the communication consents to the communication; (4) the person making the communication does not violate any equal employment opportunity law or regulation; and (5) [that person] discloses to the consumer the nature and substance of all information in the consumer's file and the consumer's right to request that information."  Luna v. Hansen & Adkins Auto Transp., Inc., No. SA-CV-17-0990, 2017 WL 8292447, at *4 (C.D. Cal. Aug. 14, 2017).  An "investigative consumer report," as defined by 15 U.S.C. § 1681a(e), is "a consumer report ***or portion thereof*** in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through ***personal interviews with neighbors, friends, or associates of the consumer***[.]"  15 U.S.C. § 1681a(e) (emphasis added).

Under this definition, the only portion of the Report which could qualify as an exempted "investigative consumer report" is the summary of the interview with Ms. Mays.  [ECF No. 47-2 at 5].  This summary recounts a personal interview between Defendant and a third-party associate of Plaintiff, aimed at collecting information about the Plaintiff's character and reputation.  The record also reflects that the Report otherwise meets the criteria of § 1681a(o), including that Plaintiff consented in writing to the nature and scope of the Report and to its disclosure to the Fire Department before any information was collected or disclosed, [ECF No. 47-3 at 15], and that Plaintiff was informed that the investigative consumer report could be disclosed to him (albeit indirectly), [Id. ("I agree that with the exception of an investigative consumer (credit) report, any information furnished may be declared 'confidential' by the City of

Everett and need not be disclosed to me.")].[5]   As such, the Court will not consider the statements included in that portion of the Report in determining liability under the FCRA.

### i. 15 U.S.C § 1681c(a) (Count I)

In relevant part, § 1681c(a)(2) requires that consumer reporting agencies must exclude from consumer reports "[c]ivil suits . . . and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."  Beyond that, § 1681c(a)(5), a general "catchall" provision, mandates exclusion of "any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years."  15 U.S.C. § 1681c(a)(2), (5).  As this Court previously held in this matter, "[m]ultiple courts have found that dismissed charges—like Plaintiff's—qualify as adverse information under the FCRA."  Meuse v. Nat'l P.I. Servs., LLC, No. 21-CV-11533, 2022 WL 2532831, at *8 (D. Mass. July 7, 2022).  However, these prohibitions against including outdated adverse information in consumer reports do not apply to those reports which will be used in connection with "the employment of any individual at an annual salary which equals, or which may reasonably be expected to equal $75,000, or more."  15 U.S.C. § 1681c(b)(3).

The parties do not dispute that Defendant disclosed in the Report that Plaintiff was arrested, nor do they dispute that this arrest occurred in 2011.  [ECF No. 38 at 6; ECF No. 50-1 at 11].  Even setting aside the interview with Beatrice Mays as an exempt investigative consumer report, the full Report also includes a reference to Plaintiff's arrest as part of the summary of Defendant's home interview with Plaintiff, [ECF No. 47-2 at 9 ("We inquired about the issue that

---

[5] As discussed infra, the interview with Ms. Mays would not violate Massachusetts General Laws chapter 151B, § 4(9) because it proscribes what information can be requested from a prospective employee, not a third party.

involved the Norfolk Police . . . .  He claims he was never arrested[.]")].  While not a "record of arrest" under § 1681c(a)(2), this reference to the outdated arrest is sufficient to establish liability based on the inclusion of "adverse information" under § 1681c(a)(5).  Serrano v. Sterling Testing Sys., Inc., 557 F. Supp. 2d 688, 693 (E.D. Pa. 2008) (finding liability under 15 U.S.C § 1681c(a) when report referenced an arrest, without including the arrest records, explaining "[t]he information concerning the existence of outdated arrest records, if excluded by a narrow reading of subsection (a)(2), falls squarely within subsection (a)(5)").  As such, the Report facially violates 15 U.S.C § 1681c(a).

That said, in its reply in support of its motion for summary judgment, Defendant included evidence to indicate that the expected starting salary for an Everett Firefighter is now $78,861.92, thus triggering the exception under 15 U.S.C. § 1681c(b)(3).  [ECF No. 51-1 at 6–8].  The evidence submitted, however, purports to provide the starting salary for an Everett Firefighter from July 1, 2021 to the present which, while instructive, is not determinative because Plaintiff applied for the job, authorized the background check, and was bypassed for the position all before this pay scale took effect and there is no evidence in the record as to what Plaintiff's starting salary would have been at the time of the Report.

Plaintiff, on the other hand, argues that his annual salary would not have exceeded $75,000, based on other public sources.  [ECF No. 49 at 13–14].  At least one of the salary ranges cited by Plaintiff could have resulted in him being paid over $75,000.  [Id. at 14].  Additionally, Plaintiff does not indicate whether the data he provides is for an entry level firefighter in 2024 or at the time he applied and consented to the background check.  [Id.].

As such, the Court finds that a material dispute exists as to what Plaintiff's salary would have been at the time of his hiring, thus leaving open the question of whether the Report's

prohibited disclosure was exempted under 15 U.S.C. § 1681c(b)(3).  Because of this, the parties'

motions for summary judgment as to Count I are <u>DENIED</u>.

### ii.   15 U.S.C. § 1681e(b) (Count III)

Under the FCRA, CRAs are required to "follow reasonable procedures to assure

maximum possible accuracy of the information concerning the individual about whom the report

relates."  15 U.S.C. § 1681e(b).  A claim under § 1681e(b) has four elements: "(1) inaccurate

information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's

failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer

suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate

entry."  <u>Richardson v. Fleet Bank of Mass.</u>, 190 F. Supp. 2d 81, 85 (D. Mass. 2001) (quoting

<u>Philbin v. Trans Union Corp.</u>, 101 F.3d 957, 963 (3d Cir. 1996)).  To recover statutory or punitive

damages, a plaintiff must show that the FCRA violation was willful.  <u>See</u> 15 U.S.C. § 1681n(a).

Regarding the first prong, the First Circuit has stated that a material inaccuracy can be

established by "showing that the report contained an entry or entries that . . . were either false or

materially misleading."  <u>McIntyre v. RentGrow, Inc.</u>, 34 F.4th 87, 96 (1st Cir. 2022) (citing

<u>Saunders v. Branch Banking & Tr. Co. of Va.</u>, 526 F.3d 142, 148 (4th Cir. 2008)); <u>see also</u>

<u>Sepulvado v. CSC Credit Servs., Inc.</u>, 158 F.3d 890, 895 (5th Cir. 1998) (explaining that

information can be "'inaccurate' within the meaning of [§ 1681e(b)] either because it is patently

incorrect, or because it is misleading in such a way and to such an extent that it can be expected

to adversely affect credit decisions").

Even if a defendant issued an inaccurate report, under the second prong of the analysis,

the defendant is liable only for inaccuracies caused by a failure to follow reasonable procedures.

<u>McIntyre</u>, 34 F.4th at 97 ("We next ask whether a jury could find that [Defendant] failed to

follow reasonable procedures for assuring the maximum possible accuracy of the information included in its reports."); see also Richardson, 190 F. Supp. 2d at 86 ("Section 1681e(b) mandates that agencies follow reasonable procedures in preparing consumer reports but does not impose strict liability for inaccurate entries in consumer reports; the preparer is held only to a duty of reasonable care." (internal quotation marks omitted)).  A court may grant summary judgment on the reasonableness of a defendant's procedures only if "the reasonableness or unreasonableness of the procedures is beyond question."  Crabill v. Trans Union, L.L.C., 259 F.3d 662, 664 (7th Cir. 2001); Wright v. Experian Info. Sols., Inc., 805 F.3d 1232, 1239 (10th Cir. 2015); Collins v. Diversified Consultants Inc., No. 15-cv-02115, 2017 WL 8942568, at *4 (D. Colo. Feb. 1, 2017), R. & R. adopted, No. 15-cv-02115, 2017 WL 971528 (D. Colo. Mar. 13, 2017); Taylor v. First Advantage Background Servs. Corp, 207 F. Supp. 3d 1095, 1107–08 (N.D. Cal. 2016).

Additionally, to establish a prima facie case pursuant to section 1681e(b), the plaintiff must "produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a 'substantial factor' that brought about the denial[.]"  Richardson, 190 F. Supp. 2d at 85.

Plaintiff identifies three portions of the Report which he argues are either inaccurate or materially misleading, which include statements about his EMT certification, prior residence at 225 Main Street, and job history.[6]

---

[6] Plaintiff at times appears to argue that the statements about his arrest within the Report also violate 15 U.S.C. § 1681e(b).  [ECF No. 47 at 15 ("Most egregiously, the Report gave a biased account of the incident involving Plaintiff and Ms. Mays.")].  However, he does not expand on this argument beyond what was argued at the motion to dismiss stage, when this Court found that "the information in the Report regarding Plaintiff's 2011 arrest is technically accurate and not misleading."  [ECF No. 22 at 9].  The Court declines to reach a different conclusion here in the absence of any additional evidence or argument.

### 1. EMT Certification

First, the Report states that Plaintiff "never bothered to take any classes in fire science or get certified as an EMT which would indicate that he is not entirely vested in a career with Everett Fire." [ECF No. 47-2 at 9]. Plaintiff argues this statement is inaccurate because he had in fact obtained an EMT certification six months prior to Defendant's investigation. [ECF No. 47 at 8–9; ECF No. 47-3 at 2, ¶ 8]. He also argues that the statement is materially misleading because he had obtained a CPR certification and completed an AED program in early 2019, which he alleges indicates a strong desire to be a fireman. [ECF No. 47 at 9; ECF No. 47-3 at 2, ¶ 7]. Defendant does not dispute that Plaintiff did in fact receive an EMT certification and a CPR certification, and it does not dispute that the statement contained in the report is inaccurate. [ECF No. 48 at 18–19]. As such, given that Plaintiff had obtained his EMT certification at the time of Defendant's investigation, this statement is inaccurate for purposes of a § 1681e(b) claim. McIntyre, 34 F.4th at 96.

Although this statement is false, the Court need not engage in an analysis of whether it was the result of unreasonable procedures because a jury, taking the evidence as presented at summary judgment, could not determine that it was a substantial factor in bringing about Plaintiff's bypass from the Fire Department. Richardson, 190 F. Supp. 2d at 87. In its bypass letter, the Fire Department lists four reasons for the bypass, none of which mention Plaintiff's lack of professional safety certifications or his commitment to becoming a firefighter. Plaintiff has presented no other evidence that this false statement caused him to be bypassed for a job with the Fire Department. As such, this statement ultimately cannot support a claim under § 1681e(b).

## 2. Residence

Second, the Report states that Plaintiff claimed to live at 225 Main Street in Everett with his friend Kyle North from 2015-2018, but that Defendant "ran an inquiry through voter's registration in order to tie [Plaintiff] physically to that address and learned he was not a registered voter."[7]  [ECF No. 47-2 at 9].  Plaintiff does not allege that this statement is false but rather that it "insinuates that Plaintiff lied about his residence" and is "willfully misleading," particularly given that Defendant's TLO Report confirmed the address.  [ECF No. 47 at 9].  In response, Defendant argues that Plaintiff was "in the best position of anyone to provide the City of Everett with documentary information to support his employment application" and argues, without support, that Plaintiff's "references and prior employers were either uncooperative . . . or provided contradictory information."  [ECF No. 48 at 18; ECF No. 38 at 18].

The statement regarding 225 Main Street – namely, that Defendant ran an inquiry through voter registration and found that Plaintiff was not a registered voter – is not facially inaccurate. Defendant did run an inquiry and determine that Plaintiff was not a registered voter, which prevented it from verifying his address through those records.  [ECF No. 47-2 at 9].  In evaluating the report, however, the Fire Department clearly took more from this statement than its truthful assertion that Plaintiff was not a registered voter, interpreting it to stand for the broad proposition that Defendant "found no proof" that Plaintiff lived at 225 Main Street.  [ECF No. 47-3 at 43].  Additionally, the record reflects that Defendant did find at least some proof that

---

[7] At points, Plaintiff seems to argue that the Report includes the false statement that "Defendant found no proof that Mr. Meuse lived at 225 Main Street . . . when in fact, Defendant's own investigative tool – which Defendant found to be reliable – verified Plaintiff's residence."  [ECF No. 47 at 5].  The Report, however, does not state that "Defendant found no proof."  Rather, it is the Fire Department's bypass letter that states that the Defendant found no proof, as discussed infra.

Plaintiff had lived at that address as evidenced by the TLO Report.  [ECF No. 47-2 at 10–13]. [8]

Given that the Fire Department was actually misled by the voter registration statement included

in the Report, a reasonable juror could find that the information about Plaintiff's address within

the Report was materially misleading.

 Plaintiff further argues that the procedure employed by Defendant to verify this address

were objectively unreasonable.  Specifically, Plaintiff argues that because Defendant knew that

voter registration data was not a reliable way to verify an address, it should have included

information in the report regarding its knowledge that young people are frequently not registered

to vote.  Further, Plaintiff claims that Defendant failed to do anything beyond checking voter

registration to verify the address, including asking Kyle North, who Plaintiff listed as a reference

and who Defendant in fact contacted during the background check.  [ECF No. 47 at 9–10]. [9]

Plaintiff also argues that he had documentation linking him to the address but that it was never

requested.  [ECF No. 47 at 10].  In response, Defendant again argues that Plaintiff was best

positioned to provide this information and argues, without support, that Plaintiff's "references

and prior employers were either uncooperative with the Defendant's investigation or provided

contradictory information."  [ECF No. 38 at 18; ECF No. 48 at 18].

---

[8] As discussed supra footnote 2, the parties have created a factual dispute as to whether TLO report was provided to the Fire Department.  Even viewing the evidence most favorably to Defendant and assuming that the TLO Report was provided to the Fire Department along with the voter registration information, it is clear that the Fire Department was under the mistaken impression after reading the Report that Defendant "found no proof" of Plaintiff's residence at 225 Main Street.

[9] In support of this argument, Plaintiff points out that the TLO Report confirmed the address but that this information "was not included in the Report," [ECF No. 47 at 9], and "was not disclosed to the Fire Department," [ECF No. 47 at 5].  Again, the record does not cleanly indicate whether the TLO Report was or was not provided.

The Court finds that factual questions exist as to whether Defendant employed reasonable procedures to verify Plaintiff's address.  A jury could reasonably find that having contacted Mr. North as a reference, Defendant should have been expected to ask him questions to verify Plaintiff's residence at 225 Main Street.  A jury could also reasonably conclude that Defendant should have asked Plaintiff to provide evidence that he lived in 225 Main Street (utility bills, pay stubs, etc.), particularly after the failed effort to verify the address through voter registration records.

Finally, the Court finds that a reasonable jury could conclude that this statement was a substantial factor in bringing about Plaintiff's bypass from the Fire Department.  Richardson, 190 F. Supp. 2d at 87.  Among the list of four reasons the Fire Department listed for bypassing Plaintiff was that Defendant's investigators "found no proof" that Plaintiff lived at 225 Main Street.  For the same reason, the Court concludes that this factual dispute is material.

### 3.   Job History

Third, the Report states that Plaintiff's "job history before and after his military service is hard to verify.  He makes his money as a Lyft driver and occasionally works for Encore Casino as a Security Officer.  He informed us that his work references will be hard to contact."  [ECF No. 47-2 at 9].  Plaintiff claims these statements are both untrue and materially misleading.  In particular, Plaintiff argues that, after being discharged from the United States Navy (for whom he worked from 2008 to 2014), he took various college classes, as well as completed infantry training with the United States Army Infantry School, all of which he claims was easily verifiable.  [ECF No. 47 at 10].  He also argues that his 2019 employment application listed three current employers –the US Army National Guard, Encore Casino, and Lyft – and that his employment with the National Guard at least was easily verifiable through a request for his DD

18

Form 214 (his discharge and separation paperwork), but that Defendants did not seek to verify that employment or his discharge status.  [ECF No. 47 at 10–11].  Finally, he argues that Defendant barely tried to contact Encore or Lyft before determining his employment for those two entities was "hard to verify."  [ECF No. 47 at 11].  Defendant offers no argument in response, other than that Plaintiff was better positioned to provide this information than the military.  [ECF No. 48 at 18; ECF No. 38 at 18].

The Court finds that a material factual dispute exists as to whether these statements regarding Defendant's employment were false or materially misleading.  In particular, the Report notes that Plaintiff's job history "after his military service" is hard to verify; yet, at the time of his application, Plaintiff's military service was ongoing, and that employment should have been verifiable through a DD Form 214.  Instead, the Report seems to imply that Plaintiff's only job history "after" his military service – by which the Report presumably means his Navy service from 2009 to 2014 – consisted of Encore and Lyft.  A reasonable jury could determine that this description of Plaintiff's job history was materially misleading.

Moreover, Plaintiff has raised issues of fact as to whether his employment at Encore and Lyft was actually "hard to verify" or whether Defendant just failed to make a diligent effort to confirm the information.  In particular, the record is unclear as to how many times Defendant attempted to contact Encore and Lyft, as well as whether Defendant should have asked Plaintiff additional questions to verify his employment during his home visit.  Plaintiff alleges that both Encore and Lyft were contacted only once, [ECF No. 48 ¶¶ 18–19; ECF No. 47 at 11], but provides no support for the claim that Lyft was contacted only once,[10] and, during his deposition,

---

[10] In his summary judgment brief, Plaintiff claims that one of Defendant's employees testified at her deposition that she contacted the number for Lyft once, [ECF No. 47 at 11], but Plaintiff does not provide a deposition transcript to support that claim.

Mr. Santin did not know how many times Encore was contacted but testified that it "would seem unlikely" that it would have only been once, [ECF No. 48 ¶¶ 18-19].  Based on the record, a reasonable jury could find that Defendant's procedures for verifying employment with Lyft and Encore were not reasonable.

Finally, the Court finds that a reasonable jury could conclude that this statement was a substantial factor in bringing about Plaintiff's bypass from the Fire Department, Richardson, 190 F. Supp. 2d at 87, as the Fire Department stated that the fact that Plaintiff's "job history before and after he left the military is hard to verify," was one of the reasons for bypassing Plaintiff for employment.

### 4.  Damages

Defendant also challenges the sufficiency of Plaintiff's evidence regarding damages, asserting that he has "offered no evidence that the defendant's actions caused him to suffer damages, whether in the form of employment (plaintiff was offered the Everett Firefighter position) or reputational harm."[11]  [ECF No. 38 at 19].  Defendant mischaracterizes Plaintiff's damages assertions.  Plaintiff alleges, albeit without much support, that he was harmed by "denied, or at least delayed" employment, lost time expended litigating in front of the Civil Service Commission, and emotional distress and humiliation.  [ECF No. 50 at 21−22; see also ECF No. 47-3 ¶¶ 16–19].  These are all recognized forms of damages under the FCRA.  Smith v. LexisNexis Screening Sols., Inc., 837 F.3d 604, 612 (6th Cir. 2016) (affirming award of damages for delayed employment); Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017) (recognizing damages for "lost time . . . attempting to resolve the credit inaccuracies");

---

[11] As noted supra, the parties dispute whether the Fire Department's May 8, 2023 letter, which stated it was a "formal offer to participate in the Everett Fire Department's hiring process," constituted an offer for employment.  [ECF No. 50-1 at 19–20].

Richardson, 190 F. Supp. 2d at 87 ("Courts have consistently held that actual damages may include humiliation and mental distress, even in the absence of out-of-pocket expenses." (citation and internal quotation omitted) (collecting cases)).  Thus, the Court cannot say that Plaintiffs fails to present a genuine issue of material fact on the question of damages.

Additionally, under the FCRA, plaintiffs can recover statutory and/or punitive damages if they can show that the FCRA violation was willful.  15 U.S.C. § 1681n(a); McIntyre, 34 F.4th at 95 (plaintiff can collect statutory and/or punitive damages for a willful violation, which "entails disregard for 'an unjustifiably high risk of harm that is either known or so obvious that it should be known'" (citation omitted)).  Here, Plaintiff has alleged many facts that a reasonable jury, if it found a violation of the FCRA, could conclude point to willfulness.  These include that Defendant provided no training to employees on the FCRA, [ECF No. 49-1 ¶ 10], that Defendant never provided employees training on what type of information could be included in its reports, [id. ¶ 11], and that Defendant's owner never considered the company as being subject to the FCRA, [id.].

Given that factual questions exist as to whether the statements about Plaintiff's residence and job history violated 15 U.S.C. § 1681e(b), and whether certain damages are appropriate, summary judgment is DENIED as to both parties motions on Count III.

### b.  Massachusetts General Laws ch. 151B, § 4(9) (Count II)

Chapter 151B, § 4(9), in part, prohibits "discriminat[ion] against any person by reason of his or her failure to furnish such information through a written application or oral inquiry or otherwise regarding: (i) an arrest, detention, or disposition regarding any violation of law in which no conviction resulted."  The statute also prohibits an employer, or their agent, from requesting any information regarding an arrest that did not result in a conviction.  Id.  The statute

21

does not, however, prohibit employers from obtaining information about criminal charges from another source.  Indeed, the Supreme Judicial Court has held that Chapter 151B, § 4(9) was intended "to protect employees from such requests from their employers and not to proscribe employers from seeking such information elsewhere."  Bynes v. School Committee of Bos., 581 N.E.2d 1019, 1021 (Mass. 1991).  While "improper questioning does not automatically equate to discrimination," Henderson v. Civ. Serv. Comm'n, No. 15-P-1265, 2016 WL 3677278 at *2 (Mass. App. Ct. July 12, 2016), "[i]n a Chapter 151B case of this type, the plaintiff need not prove that the prohibited ground for the employment action . . . was the sole basis for that action," Heagney v. Wong, 915 F.3d 805, 816 (1st Cir. 2019).  "Rather, the plaintiff need only provide 'strong' or 'direct' evidence that it was one reason."  Id.

Here, the parties do not dispute that Defendant, acting as an agent of the Fire Department, asked Plaintiff about the circumstances surrounding his 2011 arrest in his home interview.  [ECF No. 49-1 ¶ 5; ECF No. 47-1 at 28 (Defendant employee testifying that she asked Plaintiff "about the issue with respect to his ex-girlfriend"); ECF No. 47-2 at 9 ("We inquired about the issue that involved the Norfolk Police and his ex-girlfriend and baby's mother . . . .")].  Defendant argues in response that it did not violate chapter 151B because it discovered the circumstances of the arrest through an interview with Ms. Mays and not through this home interview with Plaintiff.[12]  Defendant is correct that it did not violate 151B when it asked Ms. Mays about Plaintiff's arrest

---

[12] Defendant additionally argues that it did not violate 151B because Plaintiff disclosed the arrest on his employment application in response to a direct question about criminal history and in listing Ms. Mays as a reference.  [ECF No. 38 at 13].  Defendant has provided no support in Massachusetts law for the argument that a prospective employee waives protection under 151B by proactively disclosing some aspect of a prior arrest in response to a direct application question, and the argument has no basis in the statutory text.  As such, the Court declines to find such a waiver here.  CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 58 (1st Cir. 2020) (federal court sitting in diversity "must take care not to extend state law beyond its well-marked boundaries in an area ... that is quintessentially the province of state courts.") (internal quotation omitted).

(or when it ran various other criminal background checks); however, Defendant did violate chapter 151B when it requested additional information about that arrest from Plaintiff. <u>Bynes</u>, 581 N.E.2d at 1021–22. Moreover, the record contains sufficient evidence to conclude that Plaintiff's answers to those inquiries (or, more specifically, his denials) were at least one of the reasons for his bypass. Indeed, the Fire Department listed four reasons for the bypass in its bypass letter, half of which center on Plaintiff's denials when he was asked about the circumstances of his arrest. [ECF No. 47-3 at 43]. This evidence is sufficient to establish a violation of chapter 151B, § 4(9) as a matter of law. <u>Heagney</u>, 915 F.3d at 816 (reasonable jury could find 151B violation even in absence of direct questioning of applicant because decision not to hire was based at least in part on perceiving applicant as "not forthcoming" about protected information).

As such, Plaintiff's motion for summary judgment is <u>GRANTED</u> as to Count II.

## IV.   Conclusion

Accordingly, because there are genuine issues of disputed material on the FCRA claims, the parties' motions for summary judgment as to Counts I and III are <u>DENIED</u>. Plaintiff's motion for summary judgment as to Count II is <u>GRANTED</u>.

**SO ORDERED.**

September 13, 2024                                    /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE